[No. 3612.]

## W. M. CLARK *v.* THE STATE.

1. JURY LAW — OATH. — Recital in the record that the jury "were lawfully . . . sworn to try said cause" sufficiently shows that the proper oath was administered.

2. PRACTICE — EVIDENCE. — The trial court committed reversible error in permitting the State, over the objection of the defense, to introduce in evidence a record of the court in order to show that an indictment for a different offense than that for which the defendant was on trial, was then pending against a witness who testified in his behalf. Evidence of a pending felonious prosecution against a witness is admissible only when he is

prosecuted for the same offense charged against the defendant on trial, or when the witness, being charged with or suspected of the same offense, his interest in the conviction of the defendant is made manifest. If indicted for any character of complicity in the commission of the offense, he is incompetent as a witness for the defendant, and, if presented by the State, the defense may show that he is suspected or is under indictment for the same offense, in order to show that he is interested. See the opinion *in extenso* on the question.

8. ALIBI.— CHARGE OF THE COURT ignored the defense of *alibi*, notwithstanding it was clearly raised by the evidence. Such omission, however, is not reversible error in the absence of exception or special charge on the subject.

APPEAL from the District Court of Montague. Tried below before the Hon. F. E. Piner.

The appellant in this case was convicted of arson in the burning of the court-house of Montague county, Texas, on the 31st day of March, 1884. A term of ten years in the penitentiary was the penalty awarded.

The record brings up a statement of facts covering some forty pages of legal cap. It is not essential to a full development of the case that the narratives of the several witnesses should be traced circumstantially, or reported in detail. Suffice it to say that the county court-house of Montague county, situated in the town of Montague, was discovered to be on fire by several citizens, about 1 o'clock on the morning of March 31, 1884. Those who penetrated the burning building before its demolition discovered that the floors and walls at the points where the fire was raging, and the furniture in the court-room, and in some of the officers' apartments, had been thoroughly saturated with coal oil, and that the odor of that liquid pervaded the entire building. On the morning after the fire, some battered and disfigured coal oil cans were discovered in the debris. These cans being compared with the filled coal oil cans of two merchants of the town, who, for prudential reasons, had long kept their coal oil supply stored on the sidewalk, outside of their stores, were found to correspond exactly. The merchants themselves deposed that they each missed cans from their coal oil supply on the morning after the fire.

No effort was made to apprehend the perpetrators of the crime, until after the building was so far consumed as to remove all danger of involving contiguous property, when the constable of the precinct summoned a posse, including John Clark, a brother of the defendant, to examine the surrounding country for indications of persons either having come to or gone from the town of Montague.

This expedition, however, was postponed until the morrow by a severe rainfall, the posse summoned dispersing, to meet at dawn. These parties, except John Clark, met according to agreement, and, upon the eve of starting, met John Clark coming into town, horseback, from a north direction, who reported that he had been on Salt creek without making any discovery.    The party followed John Clark's horse track, going and coming, to the place where the defendant lived, about four miles distant, having *en route* been joined by the sheriff of Montague county.    John Clark's horse's tracks, both ways, had been made since the rain.    No one was found at the defendant's house, but several horse tracks were followed by the entire party thence, as far as Floyd Jessee's house, where the party separated, two returning to town, and two, the sheriff being one, going on as far as Ben Peveler's house on Cottonwood, where they found the defendant, Bain Catlett and Peveler putting up a fence.    After the exchange of a few words, the sheriff asked the news.    Defendant replied that he had none and asked the news in town.    The sheriff replied that he had very bad news, and defendant asked if any one had been killed.    The sheriff replied that his news was worse than the killing of a man,— that the court-house had been burned.    The defendant, manifesting some surprise, expressed the opinion that the house was fired by some party or parties under indictment, and said something about one Walker George.    He said also that, being sick, he was up, off and on during the night, but saw no light towards town.

It was proved by other witnesses that there were one or more indictments pending in the district court of Montague county against the defendant and Floyd Jessee for felonious theft, but that they had been pending through several terms of court, and that defendant had always been present when his cases were called and continued, and had never expressed or manifested any disinclination to meet them.    By other witnesses it was proved that, on more than one occasion recently before the fire, the defendant had avowed his purpose to burn the court-house, and by that means get rid of the indictments against him, and that he sought the aid of Floyd Jessee, Frank Clark and Landy Howell in doing so.

A witness for the State who lived with the defendant testified that defendant, Frank Clark and Landy Howell went from defendant's house to church early on the night of the fire.    The witness went to bed a short time after the parties named started to church, and waked up when they returned, and heard the defendant say, in reply to a question, after looking at his watch, that it was twenty-

five minutes past 9. The witness went to sleep again without getting up. Some time during the night a man whom witness did not see, but recognized as John Clark by his voice, came to defendant's house, called the defendant, Frank Clark and Howell out to the fence, talked with them awhile, and rode off. Next morning, before he left his house going to Peveler's, defendant asked the witness if he knew when John Clark was at the house. Witness replying that he did, defendant requested him not to mention the circumstance, and then told him that the court-house had been burned. Before leaving home to go to Peveler's the defendant removed the shoes from his horse, and requested the witness to say nothing about it. He also requested the witness, if the question was asked him, to say that the moon was about an hour high when he got home from church on that night. The sheriff told the party, that is, witness and defendant, at Peveler's, that the court-house had been burned. When the party returned to defendant's house that evening from Peveler's, the defendant, before he unsaddled his horse, went into the house, got the overcoat which he wore to church on the night before, brought it to the door and smelt it. This witness stated, also, that, some time prior to the burning, defendant, in conversation at home, said that the court-house would be burned within two weeks; that the job was easily done by entering the north door, going up stairs, piling the furniture together, and applying coal oil and a lighted match, and that escape through a window by means of a rope was easy. Some one of the party (Howell, the witness thought) returned home one night some time after the fire, and remarked that all present were in danger of speedy arrest for burning the court-house. Witness replied that, as he had nothing to do with it, he was not afraid of arrest. Frank Clark afterwards remarked that Landy Howell was talking too much.

Landy Howell, who, upon the county attorney's agreement to dismiss the case as against him, had turned State's evidence, was the most important witness for the prosecution. He testified that, frequently before the court-house was burned, the defendant had asked his aid to fire it. He went to church with defendant and Frank Clark on the night in question. When they had nearly reached the defendant's house on their return, defendant proposed to go to Montague and fire the court-house that night. Witness replied that he did not like the job, but that, if nothing else would do, he would go along and help. Defendant, Frank Clark and witness then diverged north, went through a pasture to some brush about three hundred yards distant from the court-house, where they dismounted.

Witness remained in the brush in charge of the horses. Defendant and Frank left, going in the direction of the court-house. They returned within ten or fifteen minutes, and reported that they had secured coal oil from the sidewalk in front of two stores. They then left the witness again, returned in about thirty minutes and reported that they had fired the court-house. The three then mounted their horses and left. When they reached the road about one hundred and fifty yards from the brush, witness saw fire issuing from the windows of the court-house on the northeast corner, both below and above stairs, and from the north hall door. The cupola fell in after the party got off about two miles. *En route* home, defendant told witness to ask him, on arrival at home, what time of night it was. Witness did so, and defendant replied that it was twenty-five minutes past 9. The rain began to fall a few minutes after the party reached defendant's house. On the next morning, defendant pulled the shoes off his horse, and he and Catlett went to Peveler's. Frank started to Montague, and witness went to Floyd Jessee's with a horse he had borrowed the day before.

Ben Peveler, for the defense, positively located the defendant at home, four miles distant from Montague, at half-past 12 o'clock. He saw the defendant at that hour at home, and obtained some castor oil from him to administer to a sick child.

Several witnesses who left the church with defendant and Howell and Frank Clark, located them near, and going towards defendant's house, between 9 and 10 o'clock on the night of the fire.

Several witnesses for the defense pronounced the reputations of the principal State witnesses as bad. The State in turn supported the witnesses assailed, by others.

The motion for new trial raised the questions discussed in the opinion.

*L. C. Sparkman* and *Walton, Hill & Walton*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

HURT, JUDGE. This is a conviction for arson in burning the court-house of Montague county.

The first error assigned is that the jury "was not duly sworn." Upon this subject the record states that the jury "were lawfully . . . sworn to try said cause" (we have omitted "impaneled"). Does the record show what oath was administered to the jury? We think not. Does it appear that a different oath was administered to the jury than that required by the Code? If not, we will presume

that the proper oath was administered.   The record states that the jury were "lawfully sworn to try said cause." Suppose it had stated that the jury "were lawfully sworn," omitting "to try said cause." Evidently it would not have been obnoxious to the objection urged. Does the addition of the words "to try said cause" alter the sense already conveyed by the words "were lawfully sworn." Clearly not. For if the jury were lawfully sworn it was unquestionably "to try said cause." But again: does this entry "were lawfully sworn to try said cause" convey the idea that this was the form of the oath taken by the jury, and are we to understand from this entry that the jury only swore that they would "try said cause?" This we think would be preposterous.

The witness Peveler was a very important witness for the defendant.   By him defendant proved that, on the night of the burning of the court-house, he, the defendant, was at home; in fact, if Peveler swore the truth, defendant was not at Montague and did not burn the court-house.   Over the objections of defendant, the State introduced in evidence "the records of the district court of Montague county," which records showed that Peveler then stood indicted for breaking open the jail of Montague county in the fall of 1884.   What records of said court were introduced is not shown, neither appearing in the bill of exceptions or statement of facts. The court-house was burnt in March, 1884.

The sheriff testifies that he arrested the defendant in October, 1884.   But after a very careful inspection of this record, we have not been able to discover any fact or circumstance tending to show that defendant was ever in jail on this or any other charge previous to this conviction.   The question, therefore, presented by the bill of exceptions is: Had the State the right to introduce in evidence the records of the court, showing that an indictment was pending in said court against the witness for breaking open the jail of said county?   What purpose could this evidence serve?   Was it for the purpose of impeaching this witness?   If so, it was clearly, under the facts as presented in this record, inadmissible.

Was it for the purpose of showing that the witness was partial to the defendant?   If so, certainly there should have been some evidence tending to show that the defendant was in jail when it was charged that Peveler broke the same.   But suppose that defendant had been in jail at the time it is charged that Peveler broke open the same.   Does the indictment prove or tend to prove that defendant was guilty of breaking the same.   By no means.   For, in law, indictments furnish no evidence of guilt for any purpose what-

ever, save in cases where bail or no bail is the question. But if the indictment did furnish evidence of guilt, it certainly cannot be inferred that the object of Peveler was to liberate defendant, unless there be proof that defendant was in jail. Nor must we be understood as holding that, if there was proof that defendant was in jail, at the time Peveler is charged to have broken open the jail, then this evidence objected to would be admissible.

We are of the opinion that, under the circumstances of this case, there was error in permitting the district attorney to introduce in evidence the records of the district court for the purpose of showing that Peveler was then indicted for breaking open the jail of Montague county. That, as presented by this record, the fact that Peveler was then charged by indictment with theft or murder was as pertinent and relevant as the fact that he was charged with breaking the jail of Montague county; and we have found no authority going to the extent that evidence of pending prosecution for felonies against a witness is admissible, unless prosecuted for the same offense as charged against the defendant, or where the witness, being charged with or suspected of the same offense, it is to his interest to convict the party on trial, etc. If indicted for the same offense, either as an accomplice, principal or accessory, he is incompetent for defendant, and if introduced by the State defendant may show that he is suspected of or indicted for the same offense, and by this means establish the fact that he is an interested witness.

We deem it necessary to say that, after a careful examination of the other grounds relied upon for the reversal of the judgment by appellant, we do not think them, or either of them, well taken.

The charge of the court with reference to the necessity of corroborating the witness Landy Howell, who was an owned accomplice, is in substance the statute relating thereto, and we think sufficient. It is true that there is no charge upon the subject of *alibi*, but it is also true that the charge of the court was not excepted to for this omission, nor instructions requested supplying this defect. Looking, therefore, to the whole record, we do not think this omission calculated to injure the defendant, and hence we would not reverse because of this defect.

Because of the error of the court in permitting the proof that the witness Peveler was indicted for breaking open the jail, the judgment is reversed and the case remanded.

*Reversed and remanded.*

[Opinion delivered June 13, 1885.]